**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EHNAE NORTHINGTON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 08 C 6297 |
| | ) | |
| H & M INTERNATIONAL, | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

H & M International Transportation, Inc. operates railroad and trucking terminal facilities throughout the United States. H & M terminated Ehnae Northington, who was employed at its Northlake, Illinois, facility after she did not submit a urine sample for drug testing. Ms. Northington contends that the drug test was a set-up to retaliate against her based on state court criminal assault and battery charges she filed against H & M employee Shequita Sims, who attacked Ms. Northington outside the workplace because she was upset about Ms. Northington's relationship with her former boyfriend and the father of her child, who also worked at H & M.[1] The parties' cross-motions for summary judgment are before this court. For the following reasons, Ms. Northington's motion is denied and H & M's motion is granted.

## I.    Background

### A.    H & M's Motion to Strike

Before the court can summarize the relevant facts, it must consider H & M's contention that unspecified portions of Ms. Northington's statements of fact and the supporting exhibits are improper under Local Rule 56.1. That rule requires a party seeking summary judgment to file a statement of material facts, submitted as short numbered paragraphs containing citations to

---

[1] Ms. Northington originally also claimed that H&M had subjected her to a hostile work environment but later dropped that claim.

admissible evidence. Loc. R. 56.1(a). The opposing party must either admit or deny each paragraph and cite to its own supporting evidence. Loc. R. 56(1)(b)(3)(A). Failure to adequately reference affidavits, the record, or other materials relied upon to support the party's denial may result in admission of the movant's facts to the extent supported by the record. *See id.; Brasic v. Heinmann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997); *Arrington v. La Rabida Children's Hosp.*, No. 06 C 5129, 2008 WL 5388717, at *1 (N.D. Ill. Dec. 22, 2008).

H & M does not list the allegedly unsupported facts. The court, however, agrees that many of Ms. Northington's facts do not cite to the record. *See* Dkt. 156-1 at ¶¶ 4, 5, 23-26, 31. As H & M correctly points out, the Seventh Circuit has held that "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Thus, to the extent that Ms. Northington's facts are unsupported by citations to the record, the court will not consider them.

The court will also not consider conclusions of law (*e.g.*, plaintiff's statement ¶ 34, which contains Ms. Northington's interpretation of an earlier court order in this case) or characterizations of testimony (*e.g.*, ¶ 31, which states that a deponent testified truthfully). It further notes that it has considered the deposition transcripts themselves and not the excerpts provided by Ms. Northington, which are largely but not entirely correct. In addition, Ms. Northington appears to intend to rely on her own statement of facts as she did not respond to H & M's facts. Thus, to the extent that H & M's facts are supported by the record and are not addressed by evidence cited by Ms. Northington in her statement of facts, H & M's facts are deemed admitted.

H & M next contends that many of Ms. Northington's exhibits are inadmissible because they were not authenticated. Specifically, H & M challenges plaintiff's exhibits 4, 5A, 5B, 5C,

5E, 5G, 6-1, 6-2, 7, 8, 9, 11a, 11b, 12a, 12c, 13, 14-1, 14-2, 14-3, 14-4, 14-5, 14-6, 14-7, 14-8,

14-9, 14-10, 14-11, 14-12, 14-13, 14-14, 14-15, 15, 16a, 16b, 16c, 16d, 16e, 16f, 16g, 16h, 16i,

and 16j.

- Exhibit 4 is an undated single-paragraph statement bearing four signatures.

- The next group of challenged documents relate to a union at H & M. Exhibit 5 is a multi-page Teamsters grievance form; 6-1 is Ms. Northington's Teamsters card; 6-2 appears to be a photocopied page with instructions about obtaining representation from the Union in the event of a disciplinary action; 8 is an authorization to deduct membership dues from Ms. Northington's wages, and 9 is an earnings statement with the union dues charge circled by an unspecified person.

- Plaintiff's exhibit 11-A is entitled "return to work/school verification." It appears to be a form from Advocate Health Center memorializing that a patient received treatment and bears the hand-written notation, "proof of doctors [sic] statements when my child had an asthma attack." Exhibit 11-B appears to be an electronically generated receipt showing that Niya Penny had a doctor's appointment on May 2, 2008.

- Exhibit 12 appears to consist of documents from a state court action against Shequita Sims directing her to not contact Ms. Northington.

- Exhibit 13 is a job posting dated March 7, 2008 for a third shift programmer who can type at least 40 words per minute. The posting does not name the employer or provide contact information.

- Exhibit 14 appears to consist of a group of documents about unemployment benefits that reference Ms. Northington's refusal to retake a drug test.

- Exhibit 15 is a document signed by Ms. Northington that releases her medical records to H & M's attorneys.

- Exhibit 16 appears to be a group of documents relating to background checks made in connection with applications for different jobs after H&M terminated Ms. Northington.

Some of the challenged documents that can be identified using information in Ms.

Northington's statements of fact and appear to be business records (*i.e.*, plaintiff's exhibit 5,

which ¶ 32 of Ms. Northington's facts identifies as a statement provided by Union Steward

Wayne Herring).  Others appear to be records from state court, or documents prepared or signed by Ms. Northington.  Still others (*e.g.*, the statement signed by four people and the job posting) are undated documents that clearly need foundation to be admissible.  Be that as it may, the court will not parse through H & M's objections as they do not affect the disposition of the parties' motions for summary judgment and the facts necessary to resolve those motions are largely undisputed.  With this in mind, the court turns to the relevant facts.

**B.    Facts**

**1.    Relevant H & M Employees**

In December of 2005, Ms. Northington, an African-American female in her late twenties, began working for H & M at its Northlake facility as a "lot check." A "lot check" keeps inventory of the H & M rail yard and collects tracking identification numbers from each container before it is transported to its next destination. According to Ms. Northington, an informal duty of the lot check employee was to bring lunch to other H & M co-workers who elected to work through their lunch breaks.  Ms. Northington was employed by H & M until her discharge in May of 2008.

Bart Collins, a Caucasian male and the site's manager of operations, supervised Ms. Northington while she was employed at H & M.  At the time, Mr. Collins was married to Tanga Hoskins-Collins, the site's assistant manager.  Ms. Hoskins-Collins is an African-American female and has a daughter, Sequila Sims, who also is African-American and was employed at H & M as a Global II Programmer.

When Ms. Northington began her lot check job at H & M, Ms. Sims was romantically involved with Terrell Maghett, another H & M employee who is an African-American male. Ms. Sims and Mr. Maghett have one child together, Terrell Maghett, Jr.  Mr. Maghett's father,

Wayne Herring, was a Union Steward and spotter at H & M. Ms. Northington's mother, Linda

Hearn, is an African-American female who also worked at H & M at its Northlake facility,

where she sat near Ms. Sims during the same shift.

Mary Hayes is the Vice President of Human Resources at H & M. Margaret Snook is a

Safety Manager at H & M, Charles Connors is the President and Chief Operating Officer, Kevin

Harrington is H & M's Senior Vice President of Rail Operations, and Timothy Newcomb is H &

M's Director of Operations.

### 2. Ms. Northington's Relationship with Mr. Maghett and Ms. Sims

Ms. Northington met Mr. Maghett in 2006 and in March of 2007, the two began dating.

At no point during her employment at H & M did either Ms. Sims or Mr. Maghett supervise Ms.

Northington or exercise any position of authority over her.

Due to her prior ties to Mr. Maghett, Ms. Sims was not pleased by the budding

relationship between her co-workers. She became suspicious of and verbally abusive towards

Ms. Northington in person and on the phone, informing her, for example, that Mr. Maghett was

"her man" and that she "[didn't] want [Ms. Northington] to go get him lunch." Northington

Dep. at 103-04. Ms. Northington, however, was undeterred and continued to interact with Mr.

Maghett even after Ms. Sims said that "she was going to bust [Ms. Northington's] head … if

[she didn't] leave him alone or stop talking to him or stop going to get him lunch." *Id*. at 114.

Mr. Collins, Ms. Northington's supervisor, learned of the tension between the two

women, met with them, and advised them to keep their personal disagreements outside of work.

He also told them that fighting at work would lead to their termination. Ms. Sims nevertheless

remained distressed about Ms. Northington's role in what was, at this point, her failed

relationship with Mr. Maghett. Ms. Sims did not hide her feelings, calling Ms. Northington a "slut," "bitch," "whore," and other unflattering epithets. *Id*. at 104, 106-08.

It is undisputed that tensions ran high at the H & M yard due to the love triangle. Ms. Sims ultimately came to the job site on one of her days off to once again confront Ms. Northington in person. After seeing Ms. Sims circle the parking lot, H & M sent Ms. Northington home early with pay to avert what appeared to be an imminent unpleasant interaction. Nevertheless, the two women met face to face by the lineup trailer and Ms. Sims again threatened Ms. Northington with physical harm if she did not "leave [Mr. Maghett] alone." *Id*. at 119. Ms. Northington responded by accusing Ms. Sims of cheating on Mr. Maghett back when Mr. Maghett and Ms. Sims were a couple.

Ms. Northington complained to Mr. Collins that the harassment was continuing and told him he needed "to do something about it." *Id*. at 130. She also described Ms. Sims' actions as "personal" and noted "you can't tell me it's not." *Id*. at 138. She later met with both the Vice President and eventually the President of H & M to discuss her problems with Ms. Sims and Ms. Hoskins-Collins (Ms. Sims' mother, who as noted above was married to Mr. Collins). According to Ms. Northington, Ms. Hoskins-Collins had also begun to harass her by enforcing rules more strictly where Ms. Northington was concerned due to her daughter's unhappiness about the situation with Mr. Maghett.

Ms. Northington did not tell any H & M employee that Ms. Sims' hostile behavior was premised upon her own race or gender. Instead, she expressed that it was unfair to allow the situation to continue because she could not defend herself since doing so would lead to disciplinary action. *Id*. at 136. She later testified that she told Mr. Collins that "I don't know why this girl's got a problem with me." *Id*. at 134. Despite ample evidence – including Ms.

Northington's own testimony – indicating that Mr. Collins was aware that Ms. Sims blamed the demise of her relationship with Mr. Maghett on Ms. Northington, Ms. Northington was upset because she thought Mr. Collins did not care about why Ms. Sims was harassing her. *Id*. at 137. Ms. Northington, however, did not tell Mr. Collins why Ms. Sims was harassing her, because "how would [she] tell him when [she] didn't know." *Id*.

On June 18, 2007, Ms. Northington sent a fax to Ms. Hayes (H & M's Vice President of Human Resources) alleging that Ms. Sims and Ms. Hoskins-Collins were harassing her. At the time she sent the fax, she had "no idea" why Ms. Sims and Ms. Hoskins-Collins did not like her, although "[she] could give . . . twelve reasons" why they did not like her, so one would "have to ask them." *Id*. at 158. Ms. Northington also believed that it was "no secret" why Ms. Hoskins-Collins did not like her. *Id*. at 159.

After Ms. Hayes received the fax, Mr. Newcomb (H & M's Director of Operations) came to the worksite and held a meeting where employees expressed concerns about the management style of Mr. Collins and Ms. Hoskins-Collins. During and after the meeting, Ms. Northington told Mr. Newcomb that she wanted a raise and had been passed over for a promotion, forced to drive an unsafe truck, and been the victim of harassment by Ms. Sims and Ms. Hoskins-Collins. Ms. Northington also had a phone conversation with Mr. Connors (H & M's President and Chief Operating Officer) and told him that she was being harassed by Ms. Sims and Ms. Hoskins-Collins. Ms. Northington did not tell Mr. Newcomb or Mr. Connors that the harassment was due to her race or gender.

Mr. Connors conducted an investigation into Ms. Sims' behavior and the complaints about Mr. Collins and Ms. Hoskins-Collins. He then called Ms. Northington and told her that "things would get better." *Id*. at 193. During this call, Ms. Northington did not tell Mr. Connors

why she thought she was being harassed because she "actually [didn't] know," and that she "[couldn't] tell somebody why somebody harassing [her]." *Id*. at 195.

Ms. Northington's mother, Linda Hearn, is an African-American female who also worked at H & M in Northlake and sat near Ms. Sims during the same shift. Ms. Hearn testified that Ms. Sims would "talk nasty" (*i.e.*, "condescending") to her and all of the lot checks and groundsmen. Hearn Dep. at 54, 59 & 62. Ms. Hearn and other H & M employees complained to Mr. Collins about Ms. Sims to no avail. She did not approve of what she characterized as Mr. Collins' bossy management style where he "pretty much just gave orders" and felt that Mr. Collins "just disliked everybody period" regardless of their gender. *Id*. at 63-64, 78.

### 3.  Criminal Assault and Battery Charges Against Ms. Sims

On December 8, 2007, Ms. Northington and Mr. Maghett left the workplace together in Ms. Northington's car. Ms. Sims, still upset by Ms. Northington's interactions with Mr. Maghett, followed the pair to a gas station, "snatched [Ms. Northington's] door open" and struck her several times in the face. *Id*. at 182. Following this incident, Ms. Northington filed a police report that resulted in a criminal assault and battery charge against Ms. Sims.

Ms. Northington testified at her deposition that she did not know why Ms. Sims hit her, but that it was obvious that Ms. Sims wanted to see harm done to her. *Id*. at 183. She then clarified that Ms. Sims "did it because she could, because nobody was going to do nothing to discipline her about anything, so she figured she could do whatever she wanted to do and nothing was going to happen, which nothing happened. That's why she kept doing it." *Id*. at 184.

A Union steward told Mr. Collins about the gas station altercation started by Ms. Sims. Mr. Collins stated that he would terminate Ms. Sims if any evidence indicated that the fight took place on H & M's property.  Ms. Northington did not discuss the incident with Mr. Collins.

Ms. Sims pleaded guilty to battery in the Circuit Court of Cook County, which issued an order prohibiting Ms. Sims from having any contact with Ms. Northington.  Ms. Northington gave a copy of the order to the Union.  According to Ms. Northington, the issues with Ms. Sims continued but she did not return to state court or file another police report.

### 4.    Ms. Northington's Work Issues

Ms. Northington does not dispute that "the only thing [she] really had a problem with was tardiness, so, you know, they came up with an attendance policy with occurrences, and I had a lot of occurrences." *Id*. at 90.  She testified at her deposition that she was not disciplined for her repeated tardiness "because it was, obviously, just an attempt to harass [her]." *Id*.  She also received a one-day suspension after submitting a speeding ticket as an excuse for being late because the date on the ticket had been altered.  After Ms. Northington filed a grievance, H & M agreed to revoke the suspension and pay her because she served the suspension before the grievance was complete.

Mr. Herring (Mr. Maghett's father and a Union Steward at H & M) provided a declaration stating that Mr. Collins told him that he had papers drawn up to terminate Ms. Northington based on excessive tardiness.  After Mr. Herring advised Mr. Collins that he would pursue a grievance based on other employees who had been late but were not subject to discipline, Mr. Collins allegedly threw the papers away.

Mr. Maghett felt that Ms. Northington was being singled out by unspecified people at H & M. Plaintiff's Statement of Facts at ¶ 20. The example he provided is that she complained to Mr. Herring that an unspecified person had logged her off of her computer terminal.

### 5. Global II Programer Position

In early March of 2008, H & M had an opening for a third shift Global II programmer. A Global II programmer's main responsibility is to use a computer to assign freight to be loaded onto a specific train car for shipment. Because it was a non-union position, H & M was not required to fill it based upon seniority. Mr. Collins was responsible for filling this position. Since the Global II programmer position required substantial, time-sensitive typing and computer use, Mr. Collins wanted to find an individual who could type at least 40 words per minute.

Mr. Collins posted a notice for the position and all of the lot checks, including Ms. Northington, expressed an interest. He then advised all of the applicants that they would have to take a typing test and set a date, time, and location for the test. None of the lot checks, including Ms. Northington, showed up to take the typing test. Ms. Northington also did not submit the essay required to apply for the position.

### 6. Ms. Northington's Drug Tests and Termination

On May 2, 2008, at approximately 6:00 p.m., while Ms. Northington was in her lot check car working at the yard, H & M safety manager Margaret Snook pulled her over to conduct a vehicle safety inspection. According to Ms. Snook, Ms. Northington was speaking slowly, having trouble following Ms. Snook's statements, and had constricted pupils. Ms. Snook called Mr. Collins at home and reported that she thought Ms. Northington was under the influence of drugs. Mr. Collins drove out to speak with Ms. Northington. He reached the same conclusion as

Ms. Snook and also noted that Ms. Northington's hands were shaking, her head was dropping, and she kept trying to cover her eyes with her hands. Ms. Northington, on the other hand, admits that Ms. Snook conducted a safety inspection but denies that she was acting unusually. *Id*. at 212.

H & M allows reasonable suspicion drug testing. Mr. Collins and Ms. Snook decided to send Ms. Northington for a drug test. They assert that they had a reasonable suspicion that Ms. Northington was under the influence, while Ms. Northington contends that Margaret Snook was trying to set her up and in any event, saw Ms. Northington so rarely that she could not judge what her normal behavior was. Ms. Snook drove Ms. Northington to the Concentra medical facility in Franklin Park. While en route, Ms. Northington spoke with Union Steward Tim Brown, who told her she had to take the test but could grieve it later. The parties dispute whether Ms. Northington was acting normally during the drive or alternating between anger and hysterical laughter.

Upon arriving at Concentra, Ms. Northington took a Breathalyzer test and submitted a urine sample. A Concentra nurse determined that the sample was "too cold" (*i.e.*, that it was below the normal temperature range). Ms. Northington watched the nurse test the sample and testified at her deposition that it was between 97 and 98 degrees (*id*. at 224) or 97 and 100 degrees (*id*. at 230). She asserts that she believes the nurse lied about whether the sample was too cold, explaining:

Q:      One more question on the nurse. So it's your testimony that she lied to you?

A;      Yeah.

Q:      And why to you believe she lied to you?

A:    Because she did.

Q:    Do you have any reason – do you know why she did?

A:    Maybe she was paid.  I don't know.  You know how it go.

Q:    So you don't know –

A:    Maybe she had a reason.

Q:    You don't know why?

A:    I have no idea why she would want to lie to me and give me a hard time.
      She had a very bad attitude.

*Id*. at 226.

Concentra procedures required Ms. Northington to submit a second urine sample within three hours under the direct observation of a Concentra nurse.  The Concentra nurse instructed Ms. Northington to return to the lobby and to let a Concentra employee know when she was ready to submit another sample.  At approximately 9:45 p.m., Ms. Northington told the receptionist she was ready to provide a second sample.  The receptionist advised her that she would have to wait a few minutes until the initial nurse, who was with another patient, became available to watch her provide the sample.  Ms. Northington contends that she stated that she had to leave because her daughter was having an asthma attack and asked why another nurse could not supervise her.  Frustrated with the negative response, Ms. Northington left Concentra and refused to get back into the car with Ms. Snook.

At some point before leaving Concentra, Ms. Northington spoke with Union Steward Ted Brown on the telephone.  She forcefully expressed that she wanted to give a second sample but felt she was being thwarted by the Concentra staff who instructed her to wait for her original nurse.  *See id*.  at 238 (" I told him what was happening.  It was no secret that I was saying I can

pee right now.  I'm trying to pee again.  Give me the cup and let me pee").  She believed that "if you pee once and they're refusing you, then that's not a refusal to pee" and that, therefore, she could leave based on her daughter's emergency.  *Id.*

Ms. Snook, in contrast, asserts that Ms. Northington came back to the reception area after being told she had to wait for her original nurse, sat down, and then abruptly stood and announced that she had to leave to tend to her child.  According to Ms. Snook, she told Ms. Northington that leaving would constitute a refusal to take the drug test.

Concentra treated Ms. Northington's failure to provide a second sample as a "Refusal to Test" and reported this to H & M.  Mr. Collins passed this information on to Mary Hayes, H & M's Vice President of Human Resources, and requested that H & M consider terminating Ms. Northington.  Ms. Hayes spoke with Mr. Collins and Ms. Snook.  She also asked Charles Connors (H & M's President and Chief Operating Officer) and Kevin Harrington (H & M's Senior Vice President of Rail Operations) to consider the situation.  According to Ms. Hayes, Mr. Harrington, and Mr. Connors, they each individually concluded that Ms. Northington had refused to take a reasonable suspicion drug test on May 2, 2008, and that under H & M's policies and practices, should be terminated.  At the time they reached individual decisions to terminate Ms. Northington, Ms. Hayes, Mr. Harrington, and Mr. Connors did not know that she had filed a police report regarding the December 8, 2007, gas station incident, or that she was pursuing a legal remedy based on that incident.

Ms. Northington acknowledged H & M's proffered reason for terminating her but testified that she believes she was terminated because:

> For one – I don't know the initial reasons, but after a while I became a problem
> for Bart [Collins] and Tanga [Hoskins-Collins] and as well for [Charles] Connors
> and the company, especially when she assaulted me and no one chose to do

anything about it, and I was pissing everybody off because they didn't want to do anything about it, retaliation.

*Id*. at 246.

### 7. Other H & M Employees' Drug Tests

Four other employees at H & M's Northlake facility failed a drug test by testing positive during the time period of January of 2006 through June of 2008. Ms. Northington, as noted above, was employed by H & M from December of 2005 through May of 2008. Mr. Collins supervised three of these employees (Desmond Horan, Sean Stepter and Jeffrey Tucker).

Desmond Horan is a Caucasian male who formerly held the position of Global II Groundman/Tiedown Man. Mr. Horan sprained his ankle during his April 25, 2007, shift. Mr. Horan was tested for drugs pursuant to H & M's policies as a result of the accident. He failed and was terminated.

Sean Stepter is an African-American male who formerly held the position of Global II Spotter and was a member of the Union. Mr. Stepter injured his foot during his April 4, 2008, shift. Pursuant to Appendix A, Local 705 Contract Negotiations Drugs & Alcohol Testing Procedures of the Collective Bargaining Agreement between Teamsters Local 705 and H & M International ("Appendix A"), he took a drug test as a result of the accident. After he failed the drug test, he was terminated.

Jeffrey Tucker is a Caucasian male who currently holds the position of Global II Spotter and is a member of the Union. Mr. Tucker injured his foot during his April 4, 2006, shift. Pursuant to Appendix A, he took a drug test as a result of the accident but prior to the test, told H & M that he expected to receive a positive result. As predicted, he tested positive and was terminated. However, pursuant to Appendix A, which provides that "[a]ny employee who

advises the company prior to failing an accident or random drug/alcohol test will be given a one-time opportunity to enter into drug/alcohol treatment program at employee expense." Dkt. 151-3, Page ID# 2076. Mr. Tucker entered into a drug and alcohol treatment program and was rehired in July of 2006 after successfully completing treatment.

### 8. Ms. Northington's Complaint

Ms. Northington alleges that H & M retaliated against her in violation of Title VII. She is no longer pursuing her hostile work environment claim, but stated that she "has notified defendant that she waives her cause of action for *hostile environment* while retaining and arguing that its ugly facts and circumstances have relevancy to her claim for wrongful retaliation." Dkt 143, Page ID#1961 (emphasis in original).

Ms. Northington appears to be alleging that H & M retaliated against her by changing the requirements of the Global II programmer position to add the typing requirement immediately after she appeared in court in connection with the battery charges against Ms. Sims and because Ms. Northington had lodged multiple internal complaints about Ms. Sims. Northington Dep. at 271-75. She also asserts that requiring her to take a drug test and then firing her based on her decision to leave the testing facility was a pretext for gender-based retaliation.

## II. Discussion

### A. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.*,

970 F.2d 363, 365 (7th Cir. 1992). A court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *Id.*

To successfully oppose a motion for summary judgment, however, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, it must demonstrate that a genuine issue of fact exists. *See id.* at 587; *see also* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact" the court may: "(1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or (4) issue any other appropriate order").

The determination as to what facts are "material" in employment discrimination cases depends upon the substantive law of employment discrimination, and the burden of proof applicable under the law. *Williams v. Williams Electronics, Inc.*, 856 F.2d 920, 922 (1988). When considering motions for summary judgment in discrimination cases, the court applies these criteria with added rigor because the matters of intent and credibility are crucial issues. *See Sarsha v. Sears*, *Roebuck, & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993).

### B.    Retaliatory Discharge

Title VII prohibits employers from retaliating against employees who oppose unlawful employment practices. 42. U.S.C. § 2000e-3(a). Ms. Northington may support her retaliation claim using the direct or indirect methods. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387 (7th Cir. 2007). Under the direct method, she must present evidence of: (1) a statutorily protected activity; (2) a materially adverse action taken by H & M; and (3) a causal connection

between the two. *Id.* Under the indirect method, she must show that (1) she engaged in statutorily protected activity; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 634-35 (7th Cir. 2009). If Ms. Northington establishes a prima facie case using the indirect method, H & M must articulate a nondiscriminatory reason for its action, and if it does so, the burden remains with Ms. Northington to demonstrate that H & M's proffered reason is pretextual. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007).

Here, the court's consideration of the parties' cross-motions for summary judgment begins and ends with the protected activity prong. Read broadly, there are two possible protected activities: (1) Ms. Northington's internal complaints to H & M about Ms. Sims' behavior and (2) the filing of the her criminal complaint against Ms. Sims. For the following reasons, neither is sufficient to withstand summary judgment.

## 1. Internal Complaints

As the Seventh Circuit has noted:

> Federal law provides that an employee is to be free from racial discrimination in the workplace, which includes freedom from a racially-hostile work environment. It does not guarantee a utopian workplace, or even a pleasant one. If the workplace is unsavory for any reason other than hostility generated on the basis of race, gender, ethnicity, or religion, no federal claim is implicated. In short, personality conflicts between employees are not the business of the federal courts.

*Vore v. Indiana Bell Telephone Co., Inc.*, 32 F.3d 1161, 1162 (7th Cir. 1994).

Thus, a complaint to an employer "must indicate the discrimination occurred because of sex, race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). A general complaint about discrimination or harassment,

"without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Id.* (collecting cases).

The record contains extensive evidence supporting the conclusion that Ms. Sims intensely disliked Ms. Northington due to Ms. Northington's role – whether real or perceived – in the breakdown of Ms. Sims' relationship with Mr. Maghett. It is undisputed that Ms. Northington repeatedly complained to her superiors regarding the situation with Ms. Sims. Critically, however, Ms. Northington did not tie her complaints to her membership in a protected class (either her gender or race). Instead, Ms. Northington blamed her problems with Ms. Sims on her role in what appears to have been a messy split between Ms. Sims and Mr. Maghett. For example, she told Mr. Collins that Ms. Sims' actions were "personal" and that "you can't tell me it's not." Northington Dep. at 138. Ms. Northington also believed that it was "no secret" why Ms. Hoskins-Collins (Ms. Sims' mother) did not like her. *Id.* at 159.

Ms. Northington also simultaneously claimed that she did not know why Ms. Sims was harassing her but that Ms. Sims, as well as other H & M employees who were related to her, were attacking her because of the failed relationship. For example, Ms. Northington testified at her deposition that she did not know why Ms. Sims hit her, but that it was obvious that Ms. Sims wanted to see harm done to her. *Id.* at 183. Moreover, when Ms. Northington complained to Ms. Hayes, she claimed she had "no idea" why Ms. Sims and Ms. Hoskins-Collins did not like her, although simultaneously she felt "[she] could give . . . twelve reasons" why so one would "have to ask them." *Id.* at 158.

In addition, she testified repeatedly that she did not know why Ms. Sims disliked her. *Id.* at 134 (Ms. Northington told Mr. Collins that "I don't know why this girl's got a problem with me"). She also specifically acknowledged that she did not tell Mr. Collins why Ms. Sims was

harassing her because "how would [she] tell him when [she] didn't know." *Id*. at 137; *see also id*. at 195 (Ms. Northington did not tell Mr. Connors why she thought she was being harassed because she "actually [didn't] know," and that she "[couldn't] tell somebody why somebody harassing [her]").

Next, she contended that she complained because she believed that it was unfair to allow Ms. Sims to continue to harass her because she could not defend herself without subjecting herself to disciplinary action. *Id*. at 136. Finally, she asserted that the workplace difficulties flowing from her relationship with Mr. Maghett "piss[ed] everybody off because they didn't want to do anything about it." *Id*. at 246. She thus concludes that H & M falsely accused her of being under the influence while on the job to try to create a situation where she could be terminated.

Based on this record, a finder of fact simply cannot conclude that Ms. Northington advised anyone at H & M – whether involved in the decision to terminate her or not – that her complaints about Ms. Sims were based on Ms. Northington's gender. Instead, according to Ms. Northington herself, her issues were either based on a random workplace interpersonal conflict or fallout flowing from her relationship with Ms. Sims' former boyfriend and the father of Ms. Sims' child. *See Tomanovich v. City of Indianapolis*, 457 F.3d at 663 (internal complaints rise to the level of protected activity only if they indicate a connection between the discrimination or harassment and the complainant's membership in a protected class). Thus, Ms,. Northington has failed to show that the events following her internal complaints were based on her gender.

### 2. The State Court Criminal Proceedings Against Ms. Sims

Ms. Sims pleaded guilty to battery after she followed Ms. Northington and Mr. Maghett after they left work together and hit Ms. Northington in the face following a confrontation

between the two women at a gas station.  Ms. Northington provides three reasons why her pursuit of state court remedies following this incident is purportedly due to her gender and thus is statutorily protected:  (1) Ms. Sims' attack "resulted from her sexual resentment that her former boyfriend, Terrill [sic] Maghett had taken a liking to [Ms. Northington] after moving out of [Ms.] Sims' house" (Dkt. 155 at 8); (2) Ms. Sims used "sexual slurs" such as "whore" and "bitch" to describe Ms. Northington so Ms. Sims' "dislike and hatred" of Ms. Northington had "sex in the background" (*id.*); and (3) Ms. Northington had to turn to the state court criminal system as a last resort after H & M failed to stop the allegedly gender-based harassment by Ms. Sims (Dkt. 156 at 6).  The court need not reach whether the individuals responsible for the decision to terminate Ms. Northington knew about the criminal complaint against Ms. Sims because even if they did, the record fails to show that Ms. Northington's complaint is statutorily protected.

### a.  "Sexual Resentment"

To establish a claim for gender-based retaliation, a plaintiff must show, among other things, that the challenged conduct was directed at her because of her sex.  *See, e.g., Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001).  As discussed above, Ms. Northington did not tieDecember 29, 2011 her problems with Ms. Sims to her gender as she either did not know why Ms. Sims, Ms. Hoskins-Collins, and Mr. Collins were acting as they allegedly did or believed they were doing so because Ms. Sims was upset after Mr. Maghett left her and started dating Ms. Northington.

Title VII prohibits retaliation based on membership in a protected class and "proscribe[s] gender-based harassment even when it is not motivated by sexual desire."  *Berry v. Delta Airlines, Inc.*, 260 F.3d at 810-11.  It does not, however, require an employer to discipline an

employee who behaves inappropriately in the workplace because her long-term boyfriend starts dating another co-worker. *See Minor v. Ivy Tech State College*, 174 F.3d 855, 858 (7th Cir. 1999) ("It is not enough that a supervisor or coworker fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor. Such failures are too commonplace in today's America, regardless of the sex of the employee, to be classified as discriminatory").

Viewing the record in light of the facts most favorable to Ms. Northington, it is clear that Ms. Sims behaved in a far from admirable manner after Mr. Maghett left her and started dating Ms. Northington. Nevertheless, Ms. Northington's belief that H & M was required to intervene in the interpersonal dispute created by Mr. Maghett's decision to date Ms. Northington fails to show that H & M acted because of Ms. Northington's gender. "Sexual resentment" directed at a co-worker dating a former longterm boyfriend flows from emotions caused by the failed relationship. As acknowledged by Ms. Northingham herself, it is "personal" and thus not based on gender. Northington Dep. at 138.

### b. Slurs

This conclusion is not altered by Ms. Sims' use of anti-female epithets to describe Ms. Northington. Ms. Northington references the slurs to support her claim that she was the victim of gender-based retaliation. A contention that a co-worker subjected a plaintiff to language demeaning women is generally relevant to a hostile work environment claim. Ms. Northington, however, dropped her hostile work environment claim. She appears to be arguing that the slurs were based on her gender and that H & M ignored the slurs and eventually set her up so it could terminate her. She then concludes that because the slurs were allegedly gender based and part of

the chain of events leading to her termination, the allegedly retaliatory termination was also based on her gender.

This line of reasoning fails because as discussed above, Ms. Sims' conduct was not based on Ms. Northington's gender. "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . because of . . . sex.'" *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007), *quoting Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). "[P]erceived unfairness in the workplace" thus may not "be ascribed to discriminatory motivation merely because the complaining employee belongs to a [protected class]." *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005).

The court strongly disapproves of calling a female a "whore" or "bitch." Nevertheless, the assertion that Ms. Sims' "dislike and hatred" of Ms. Northington had "sex in the background" and thus was based on Ms. Northington's gender is wholly speculative and thus is insufficient to establish liability or withstand H & M's motion for summary judgment. Moreover, even setting aside causation issues (*i.e.,*, whether H & M's decision to terminate Ms. Northington can fairly be attributed to the slurs), nothing in the record suggests that Ms. Sims intended to demean Ms. Northington based on Ms. Northington's gender. Instead, Ms. Sims either acted randomly (if the trier of fact accepts Ms. Northington's testimony that Ms. Northington did not know why Ms. Sims and her supporters disliked her) or belittled Ms. Northington because she was lovelorn (if the trier of fact accepts Ms. Northington's testimony that Ms. Sims and her supporters were distraught after Mr. Maghett left Ms. Sims and their child to date Ms. Northington). Accordingly, Ms. Northington's reliance on Ms. Sims' use of gender-based slurs to establish that she was a victim of gender-based retaliation is unavailing.

### c.     The Filing of the Police Report

This brings the court to Ms. Northington's argument that she was forced to turn to the state court criminal system as a last resort after H & M failed to stop the allegedly gender-based harassment by Ms. Sims.  According to Ms. Northington, the existence of the "police report resulted from sex" so H & M's refusal to discipline Ms. Sims and its eventual decision to pursue unfounded drug testing and terminate her were retaliatory and based on her gender.  *See* Dkt. 155 at 8.

This argument fails because the existence of a police report based on the gas station punches thrown by Ms. Sims, the spurned member of the Sims-Northington-Maghett love triangle, fails to shows that Ms. Sims harassed Ms. Northington because Ms. Northington was female.  Instead, at most it shows that Ms. Sims' actions were based on her belief that Ms. Northington had stolen and was romantically involved with "her man."  Ms. Northington herself explained that she believes she was terminated because she "became a problem for Bart [Collins] and Tanga [Hoskins-Collins] and as well for [Charles] Connors and the company, especially when she assaulted me and no one chose to do anything about it, and I was pissing everybody off because they didn't want to do anything about it, retaliation."  Northington Dep. at 246.

Not wanting to become involved in what can only be characterized as a tangled situation involving numerous employees, most of whom are related by blood or marriage, may be craven.  However, federal law does not require an employer to discipline an employee who is mired in emotional shoals following an uncomfortable break-up with a co-worker.  *See McKenzie v. Milwaukee County*, 381 F.3d 619, 624 (7th Cir. 2004) ("Title VII is not a general code of workplace civility, nor does it mandate admirable behavior from employers").

Moreover, Ms. Northington has not pointed to any authority supporting her position that her police report is protected under Title VII. A police report based on an off-site incident involving a disgruntled co-worker is easily distinguishable from a report involving on-the-job touching by a supervisor. *See Worth v. Tyer*, 276 F.3d 249, 265 (7th Cir. 2001) (a police report alleging that the defendant touched the plaintiff's breast while she was in her office is statutorily protected expression under Title VII).

In addition, as with her complaints about Ms. Sims' workplace behavior, Ms. Northington never notified H & M that the battery complaint was based on gender-based animus by a co-worker. Instead, she gave a copy of the order of protection to the Union to pass on. *See* Northington Dep. at 186 ("Actually, I felt that it would be useless for me to provide it because [H & M] didn't want to hear anything I had to say, so I had the union provide it to them"). This dooms any claim today that a battery complaint based on an off-site punch thrown by Ms. Sims was due to Ms. Northington's gender instead of Ms. Northington's relationship with Ms. Sims' ex-boyfriend. *See Sitar v. Indiana Department of Transportation*, 344 F.3d 720, 727-28 (7th Cir. 2003) ("Although an employee need not use the magic words 'sex' or 'gender discrimination' to bring her speech within Title VII's retaliation protections, she has to at least say something to indicate her gender is an issue . . . . [the plaintiff] conceded that she never told [her employer] that sex discrimination was her real problem. That is enough to doom her claim of a retaliatory transfer").

### 3.     Ms. Northington's Allegedly Thwarted Promotion

Finally, Ms. Northington appears to be alleging that H & M retaliated against her by changing the requirements of the Global II programmer position to add the typing requirement immediately after she appeared in court in connection with the battery charges against Ms. Sims.

Ms. Northington asserts that because H & M purportedly had Ms. Hoskins-Collins post the typing requirement immediately following the court hearing when Ms. Sims pleaded guilty to assault, she has demonstrated that factual questions exist regarding H & M's motivation for requiring applicants to be able to type 40 words per minute. *See* Northington Dep. at 272 ("Q: So you're alleging it was retaliation – they retaliated against you by changing the criteria? A: Taped right by the time clock, like ha-ha, now you're not going to get your job. Yeah."). Ms. Northington also asserts that Mr. Connors told a union steward, who presumably relayed the alleged comments to Ms. Northington, that if he had to pay Ms. Northington her salary for time taken to file the complaint against Ms. Sims, he would "get her." *Id*. at 273.

Even if the court accepts Ms. Northington's version of events, "suspicious timing alone does not support a reasonable inference of retaliation." *Surita v. Hyde*, — F.3d —, No. 09-1165, 2011 WL 6644218, at * 17 n.4 (7th Cir. Dec. 22, 2011). Instead, the court must consider the timing "in combination with other evidence." The "get her" comment attributed to Mr. Collins is inadmissible double hearsay and thus may not be relied upon to defeat summary judgment. *See* Fed. R. Evid. 802; *Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003). The animus attributed to Ms. Hoskins-Collins flowing from her daughter's guilty plea is irrelevant as no evidence shows that Ms. Hoskins-Collins was responsible for the decision to include the typing requirement. *See Filippo v. Northern Indiana Public Service Corp., Inc.*, 141 F.3d 744, 750 (7th Cir. 1998) (employee's speculation that union retaliated against her for running for local union president not sufficient to create genuine issue of material fact to defeat summary judgment motion).

Moreover, the allegedly suspicious timing is based on Ms. Northington's theory about H & M's motivation in including a typing requirement, not a statement allegedly made by Ms.

Hoskins-Collins.  This is insufficient to support an inference that H & M acted due to gender-based animus.  *See id*.

In any event, even if Ms. Hoskins-Collins had made a statement, it would have not helped Ms. Northington survive summary judgment as Ms. Hoskins-Collins was not a decision-maker and Ms. Northington asserts that Ms. Hoskins-Collins was acting in solidarity with her daughter, Ms. Sims, as opposed to at the direction of a decision-maker.  *See, e.g., O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 986 (7th Cir. 2001) ("Statements by a non-decision-maker that amount to mere speculation as to the thoughts of the decision-maker are irrelevant to an inquiry of discrimination").  The court thus finds that Ms. Northington's arguments about the typing test are unavailing.

## III.     Conclusion

The court appreciates that Ms. Northington is dissatisfied with her termination.  Nevertheless, she is not entitled to summary judgment on liability and cannot withstand H & M's motion for summary judgment because she has failed to demonstrate that she engaged in protected activity.  Accordingly, her motion for summary judgment [154] is denied and H & M's motion for summary judgment [148] is granted.

In addition, H & M's unopposed motion to supplement the record with deposition excerpts inadvertently omitted from its Local Rule 56.1 statement [162] is granted.  Ms. Northington is given permission to substitute any electronically filed documents containing her Social Security number with a version redacting that information.  If she does so, the clerk shall

remove the original documents from the CM/ECF system.  The clerk is directed to enter a Rule

58 judgment and terminate this case from the court's docket.


DATE:   December 29, 2011

Blanche M. Manning
United States District Court Judge